Good morning, Your Honors. May it please the Court, Benjamin Schatz of Manette, Phelps, and Phillips, for Appellant Flying J. Flying J's second amended complaint was erroneously dismissed on two legal grounds that are reviewed de novo, mootness and collateral estoppel. This Court's already addressed the mootness argument in its prior appeal, and nothing has really changed since then to affect any of the theories articulated by the judges on that panel. The only new development is the loss of Flying J of its mandamus action in state court, which the defendants are attempting to use as collateral estoppel. And so that is where I'm going to focus. The defendant's theory is that the loss in the mandamus action means that Flying J doesn't have an action against them. But, of course, these are two very, very different types of proceedings. The ---- Ginsburg The proceedings aside, the California court of appeals made two or three rather critical determinations. And so to me the question is whether those determinations don't effectively preclude you from proving any of your, whatever it is, five or six causes of action. That is, just for shorthand, that the reconsideration hearing cured any conflict of interest issues, and that the commission had discretion to and did determine that the proposed exchange with Flying J would have been illegal anyways. So those two determinations kind of are core, and so if you could explain why it is that they don't preclude you from going forward on the claims, I'd appreciate it. Certainly. The determination of a cure by the reconsideration hearing is a cure only with respect to claims against the commission. It doesn't change the theory that the Lawson and Pistachio conspiracy caused that reconsideration hearing to even exist. And so as Judge Reinhardt had articulated in the first appeal, if you roll it back to the very beginning, that reconsideration happened only what was a result of the wrongdoing. What somebody said from the bench is, you know, what someone said from the bench. Sure. But then we were given leave to amend and did so in accord to revive that theory, which rolls all the way back, plus the theory also articulated of an interim harm even before the reconsideration hearing. So there's no way for the defendants to say that the commission's cure of its own problems. But the combination of the two is really critical. I mean, if you have determined that the exchange was not cricket and you've determined that whatever infected the 2003 proceedings was eliminated by the 2004 reconsideration, why doesn't it wipe out any possibility of showing harm? You couldn't have gotten the property anyways. It couldn't have happened. So even if everybody were terrible out there, what difference does it make? Well, but that second hearing, that reconsideration hearing, never would have happened had it not been for the conspiracy, because at the outset. Exchange could never have happened because it wasn't consistent with the commission's interpretation of its own regulation in Highway Code something or other. Well, but that was a discretionary call. The only thing the California court of appeal decided was that the commission had discretion to approve the exchange or not to approve the exchange. The court of appeal did not say as a matter of law this exchange could never have taken place. That's what the trial court said, but that's not what the court of appeal said. And the California court of appeal said explicitly that was not error. I don't know how you can read it any other way. That exercise of discretion. Well, no. It was referring to the California superior court's determination, a whole paragraph, and at the end of it, it said it wasn't error. But that actually helps us, though, because the point is that the commission had discretion. It could have gone the other way. And so the question is, why is it that the commission went the way that it did? That can be traced back to the Lawson and Pistachio conspiracy. Isn't the problem here that the commission woke up and found out that the acreage was woefully undervalued in this conveyance, this settlement agreement, and that but for the cabal between Pistachio and Lawson, they never would have wised up? So the cabal and their meddling resulted in Flying J getting caught with a better-than-market deal that the commission rightfully said we can't sell on these terms. We can't sell because it's contrary to our resolution in terms of it's not a real exchange, and we have a faulty we certainly have a faulty appraisal. We're not going to sell it to you. It doesn't matter what series of events triggered our attention, brought our attention to this, but we're not going to sell it, which the settlement deal is off. Well, the fact that there are alternative bases for the decision, I think, shows that there shouldn't be collateral estoppel to use that against Flying J for the conspiracy theory. But you can't, given the rulings at the state court level, you can't show causation at all. Well, but the causation is that that determination never would have been made. So you wouldn't have gotten, they'd have never wised up. That's the argument that you want to present at trial. They never would have wised up if it weren't for Pistachio and Lawson tinkering with the system. I suppose you could try to phrase it that way. But our theory is not that this was a bad deal to begin with. I mean, it's true that the commission wanted to see it that way, but there were other factors involved that made it a very reasonable deal. Caltrans thought it was a great deal, and it was their deal to make with Flying J. And everybody thought that this was going to happen, and it gets put on the consent agenda, and one out of a zillion cases magically gets picked for scrutiny and derailed. And Flying J's theory, and all we're asking for, is to be able to go to a jury and say, you know, it was no coincidence that it was Lawson that picked this out for scrutiny. There's no coincidence that Lawson has these connections with Mr. Pistachio, who has this vendetta against Flying J. And to take it even a step further, beyond what we're talking about, Lawson had the commission issue an auction order, which is totally illegal. The commission has no authority for that. But according to the State Court of Appeal, all that doesn't matter, because on the reconsideration it was 7-1, right? And no matter what, anybody out there wouldn't have made any difference. Well, you know, that magic it doesn't matter language relates to any action against the commission. Sure, it doesn't matter to the commission. The commission has cleansed itself. No, it relates also to, you know, whether this deal would have been made. I don't think so, Your Honor, because focus on what the mandamus action was about. That's trying to get a State court to order a State agency to do something. To do what? To do what? In the mandamus action, we were ‑‑ Flying J was asking the State court to order the commission to undo the auction and to approve the exchange. To go through with the deal that you have the property, right? Yes. That's what they were talking about. And they said it wouldn't have made any difference, because the ‑‑ in other words, the reconsideration is like an intervening cause. It washes everything else away, doesn't it? No, it doesn't, if it's ‑‑ if that, quote, intervening cause is a result of the actual misconduct. It's like the party who throws himself on the mercy of the court as an orphan after killing his parents, or the lawyer who gives negligent advice to a client and when he's sued for malpractice says, well, but the court ruled that way. I mean, you have to get back to the original cause. And so that's why it's so important to keep in mind that the standard in the mandamus action was to ‑‑ All the original cause does is it causes the commission to reconsider. And the reconsideration is a wholly independent action. Well, but there's ‑‑ That's in effect what the State Court of Appeals said. The ‑‑ Not influenced by any of the shenanigans that went on in the past, right? Two responses. One is, you know, human nature makes it very difficult for public officials to change their minds publicly when they're shown to have been part of a problem. But even ‑‑ They did change their ‑‑ it's obvious they changed their mind. No, they didn't change their mind. That's a fact. What do you mean? They approved ‑‑ they disapproved the exchange. They didn't go through with the exchange. That's a change of mind. They didn't go through with the exchange. Didn't they change their mind? They didn't change. The original decisions, which we allege were corrupt, were to disapprove the exchange. And they said, oh, okay, we'll look at it again. Oh, and we disapprove it. But what's even more important is the auction order, because the commission refused to even look at that, refused to correct its own obvious error. And that's what put the property into the hands of Pistachio. If you had ‑‑ if you took this case to trial and you were to prevail, wouldn't it, for you to prevail, a jury have to make a finding that was 180 degrees opposed to the finding in your mandamus action? No, Your Honor. Absolutely not. Because the only finding ‑‑ That's a serpentine. Are you going to have to explain that one to me? Because the only finding in the mandamus argument was that the commission had discretion at reconsideration to approve or disapprove the exchange, and they exercised discretion to disapprove the exchange. And they had authority to do that, and the State court was not going to order them to change their mind. That's the only finding. There was no finding that Lawson was clean or that any of this other stuff was acceptable. And it's ‑‑ you know, I've read that decision over 50 times. Inherent in their decision is a determination that the reconsideration process was pure. That's right. They do say that, but ‑‑ You can't get a plaintiff's verdict at the trial court unless they reach a totally different conclusion on that issue, that it was not pure, that it was tainted, still tainted by the original meddling by Pistachio and Lawson, and, therefore, the deal should ‑‑ the exchange, you should get the benefit of that bargain in one form or another. Well, there are damages other than that. Again, it doesn't address the auction order. It doesn't address the interim harm theory. I mean, Lawson and Pistachio cannot get off scot‑free simply because the commission reconvenes itself and rubber stamps what it did before. They still, we allege, committed wrongdoing. And all we want is the ability to take that story to a jury. And at the very least, the damage ‑‑ But if there was wrongdoing, then you would have won the mandate action. No, Your Honor. Absolutely not, because the standard is so very different. What the commission does is cloaked with the authority ‑‑ But they can't exercise their discretion if they did something wrong on a wrongful basis. But that doesn't ‑‑ the point that they had discretion would mean that they could have gone either way. And the fact that it was a reconsideration meant that the train had already left the station. They had already decided what they wanted to do. And so the momentum was all in favor of rubber stamping it. And with the additional discovery, we've been able to connect Commissioner Lawson, who was on that reconsideration ‑‑ I'm sorry, Commissioner Lawrence with Lawson. And so, you know, the conspiracy continues all the way through. I see my time's almost up. I'd like to reserve it for rebuttal. Thank you. Certainly. Good morning. My name is Bill Hasey, and I represent Mr. Lawson and Lawson Rock & Oil Company. There are no claims that are alleged in this case or that could be alleged that haven't been foreclosed as a matter of law. All the claims that are or could have been alleged are contingent on Flying J's right to the property. And it's been decided against them on at least three different occasions that they have no right to the property, either actual or reasonably probable. Both the CTC and two different state courts have so concluded. And most importantly, those same two different state courts have repeatedly and soundly rejected Flying J's challenges to the propriety of the 2004 reconsideration proceeding that as a matter of law moots this case. I just want to go brief procedural review that I think is important. Flying J first filed the lawsuit in November 2003. About a month later, they made a request to the CTC to reconsider the decision to approve or disapprove the conveyance, and that was granted. And in February 2004, the reconsideration proceeding was conducted. In fact, the result was actually unanimous, seven to zero, against approving the conveyance. The reconsideration resulted in denial of the conveyance for two reasons. One, the CTC concluded that the conveyance was in conflict with their own guidelines. And secondly, that the property transaction was based upon an appraisal that was substantively flawed. And Flying J, a month later in March of 2004, filed a mandamus action in Kern County Superior Court against CTC and Caltrans, and they challenged, among other things, the 2004 reconsideration hearing. And two months after that action was filed in May of 2004, Judge Coyle in this action down below dismissed the case on the grounds of mootness, and the case came up to this court. And this court, without deciding any of the mootness arguments or whether the new facts would save the case or not save the case, decided that Flying J should be given leave to amend. That was the court's decision in November of 2006. But the circumstances that affect this case further changed after that decision. While this case was pending on appeal in this court, Flying J was litigating the action in state court, and they went to trial in April of 2005, and they lost on every single claim, including their claim challenging the propriety, the validity, the independence of the 2004 reconsideration proceeding. What about your opponent's argument that, well, the only issue that the mandate action really decided was that the commission was acting within its discretion and not, you know, that it was something they either had to do or they had to reverse some prior action, and that because it was a discretionary action, Flying J still has a claim because of your interference at the earlier stage? Let me take that in two parts, if I may, Your Honor. The state trial court decided that the transaction was illegal. It was unauthorized under both. But that wasn't approved by the court of appeal. Well, I believe the court of appeal concluded two things. One was that the 2004 reconsideration cured any defects that may have existed earlier. And secondly, as the district court in this case found, that they found that the transaction was unauthorized under the CTC's guidelines. And as the court stated, you know, to conclude otherwise, you know, as Flying J was suggesting, you have to engage in a tortured reading of the decision. Now, there is no interim damage claim. And the reason there is, and the last time this case came to this court and down below, they tried to convince you and the district court that there was a claim between October 2002 and February 2004. But there is no claim as a matter of law, because any claim of such nature is contingent upon them either having an actual right or a reasonably probable right to the property. And they have lost that on two occasions, in the trial court, in Kern County, and on appeal. The 2004 reconsideration concluded they have no right to this property, and that decision was clearly affirmed by the Fifth DCA. So they can't say that at any time they had a right to this property that was either actual or probable. The settlement agreement itself said that it was subject to approval by the commission. That's correct, Your Honor. And the commission never, for whatever reason, never approved the settlement agreement and the exchange. That's correct. It went before the commission on two occasions where they actually voted on it. The first time it was 6 to 1. The second time in 2004 was 7 to 0, disapproving the exchange. But in terms of the interim damage claim, they can't say that any time they had a right to the property, and so they can't base a damage claim going back to October 2002 or at any time thereafter. You know, two courts have told them they don't have a right or an expectancy to this property. And that's, I think, important because four months after this case left this court, the Fifth DCA made its decision in March of 2007, and they clearly upheld the propriety of the 2004 reconsideration proceeding. And they said it cured any earlier defects that may have existed. And so that judgment became final in June of 2007, and we filed our motion subsequent to that. And that decision that relates to the 2004 reconsideration proceeding forever precludes Flying J from raising any further challenge to the propriety of the 2004 reconsideration proceeding and renders further moot this case because it makes it unequivocally clear that Flying J either had no contract right to the property or reasonably probable right to the property and had no further basis for proceeding. I'm going to give the rest of my time to Mr. Leonard. Okay. Thank you, Mr. Leonard. Unless the Court has specific questions, then I'll leave. I don't have any questions. I'm sorry. I do have a question about the injunctive. As I understand it, Pistachio wound up with the property. No. He has an option to purchase the property, which is still subject to the approval of the CTC. Is there any vitality to the Flying J's request for injunctive relief under the fair competition law given the early involvement between Pistachio and Lawson? No, I don't believe so on the basis of the position that's already been articulated. Does Flying J have standing to make such an argument? I don't think so. That was really my only question. Thank you. Your Honors, I think we've lost sight about what this case is about. It's not about Flying J getting the property. It's about Lawson and Pistachio conspiring to interfere with Flying J's deal with Caltrans. Flying J had a deal that was worked out with Caltrans, and everybody thought it was going to happen. It was put on the consent agenda, and those things are always approved, 99.9 percent of the time. There was never one that had been questioned. Only this one. Lawson questions it, and suddenly it gets scrutiny, and suddenly there are other reasons to reject the exchange, and that's where we end up today. Oh, and also an auction order, which was illegal, puts it out onto the public so that, lo and behold, Pistachio gets it. Flying J has a great case, and I would love to put it in front of a jury. If a jury is going to say that that's all innocent coincidence, that's fine. But at the pleading stage, Flying J has presented its argument. And the fact that the, you know, that the mandamus action happened doesn't interfere with that, because the question here is, was it reasonably probable that Flying J could have gotten the property? That's all we need for the tort claims of interference with prospective economic advantage and contract. And so that's the case in a nutshell. And then, of course, there are interim damages, because Flying J had to engage lawyers to do the investigation that disclosed the Pistachio-Lawson connection that got them the reconsideration, which then, unfortunately, was rubber-stamped with the same result. But none of that should be surprising. And that's why this case really should proceed on the merits. Thank you, Your Honors. Okay. Thank you, counsel, all of you, for your argument. And the matter just argued will be submitted. And we'll next hear argument in Ballard v. Wal-Mart. Good morning, Your Honors. May it please the Court. I would like to reserve three minutes for rebuttal. This case presents several important questions concerning the standards for certifying class actions in this circuit. We respectfully submit that the district court committed legal error in certifying the class, and the class certification order should therefore be reversed. First, the district court committed legal error when it decided that it would not apply what it called full-fledged Daubert scrutiny to the testimony, the expert testimony submitted by the plaintiffs from Dr. Shapiro. The court, in reaching that conclusion, relied on Judge Patel's decision in the Kurohara case, which had also, which had in turn relied on the district court's decision in the Dukes case. Those decisions relied on two Second Circuit decisions, the Kharadad case and the Visa Check case, which have now been disavowed by the Second Circuit itself. And the fundamental error, we believe here, is that the district court felt itself constrained to, in terms of weighing the competing expert testimony on both sides and viewed the inquiry as to the reliability of the expert testimony submitted by Dr. Shapiro to be subject to less scrutiny than it would be in an under-merits trial. Kagan. Mr. Boutrous, what exactly is your contention with respect to the reliability prong, assuming you're right? Because it strikes me that your principal position is that the expert, Shapiro, simply failed to take account of the elements of the cause of action under the Labor Code and Section 208. If that's so, why isn't that, in effect, an error that goes more to whether the court got the call right on predominance rather than to whether the expert opinion is reliable? I think it's both, Your Honor. With respect to the expert testimony itself, it's more a question of, well, two things. First, it's unreliable. The testimony was, as the district court found, filled with errors, and even after being corrected, the court found questions about the competency. But put that aside. Putting the errors aside. The lack of fit between what Dr. Shapiro was called to testify to do, which was to give testimony that there were class-wide proof that could be given as to the elements of the claim, and his failure to consider the actual evidence that was used during the termination process, the personnel files, the actual data that goes into the process, and then his conclusions leap beyond what the data that he relied on would show. And I think the Supreme Court's decision in the GEV Joiner case talked about the fact that sometimes in experts' testimony, there's too great an analytical gap between the conclusions and the data and the methodology that was used to reach them. So I think that's the Daubert piece of it. But I do think, Your Honor, there's a significant error on the predominance inquiry because, and this is another pure legal error, the district court equated on page 18 of the excerpts of record, equated predominance with commonality and ascertainability. And that is incorrect. The Supreme Court, Justice Ginsburg's opinion in Amchem for the Supreme Court, said that predominance is a much more demanding standard than commonality, and it requires a determination, a weighing of whether the individual issues predominate over the common issues or vice versa, and that it's a very vital prescription. But the district court explicitly said they were the same thing here and did not look at the expert testimony on both sides and make a determination as to whether the common issues, to the extent they existed, predominated over the individual issues, and we think that was error. So if that were correct, then what should we do about it? Send it back for a determination under a correct standard? Or what? I think here, Your Honor, the Court can simply reverse the class certification order, vacate it and reverse, because the plaintiffs, the courts, the Second Circuit, for example, in the McLaughlin case, which we cited, which was a certification order reversal, reversed, finding that the plaintiff's theory and its methodology and their approach to proving class-wide issues was flawed and that applying the correct legal standards, that a class could not be certified. And we think that's correct here because the plaintiffs staked their claim on their expert relying on these computerized databases as opposed to the actual evidence concerning the standards in the statute. And even when challenged on that, they stuck with that. That's the record before the Court. And the plaintiff's theory, we believe, is focused solely on the computerized databases. That's a fundamentally legally erroneous theory. Do you want us to conclude that Shapiro is not a reliable expert? There are really two pieces to it, Your Honor. First is lack of reliability because of the multiple errors and the flaws in the analysis that was presented to the district court in the first instance, plus the lack of reliability of a methodology, a methodology that did not include an analysis of the actual provisions in the statute, of the relevant evidence and conclusions that leap far beyond where the data would take the expert. That would be one way to rule that his testimony was unreliable and does not demonstrate class certification, and therefore, the order should be reversed. Alternatively, if the Court were to clarify the standards, it could reverse and remand for further proceedings under the opinion. But we think the result would be the same. And the record before the Court is very clear that the plaintiffs did not meet the standards governing certification. Let me ask you a preliminary question before we get there. Isn't this the basic underlying issue of the, you know, the extent to which Shapiro has to be qualified for class certification purposes, isn't that almost the same as the question in the Dukes case? Yes, Your Honor. That issue and the question of the competing expert testimony. Shouldn't we just hold this case until Dukes is decided? That's certainly one option for the Court. There are other issues. Do we have any other option? Well, there are other issues in the Dukes case that could be decisive in that case as well. You mean the in-bank Court might not reach this question about the expert qualification? Correct, Your Honor. That's correct, Your Honor. There are questions about the standards for B-2 certification and other issues. But certainly there are overlapping issues here. And I would point out that to the standards. Yes, Your Honor. On the Daubert issue, but not on the predominance issue, which isn't raised in Dukes, is it? Not exactly in this way. Not exactly in this way. That's correct, Your Honor. There are different predominance issues and different issues concerning individualized issues. The Dukes case does present the question of whether the district judge is entitled to and must weigh the competing expert testimony. The district judge in Dukes relied on the same line of cases that has now been disavowed by the Second Circuit. So there is overlap there. With respect to the individualized issues, I would just say that there were a number of issues that Dr. Shapiro's testimony simply cannot demonstrate on a class-wide basis. Number one, liability. He did not purport to opine that there was a basis for class-wide liability determinations. He only purported to opine about calculating damages. So that's just a basic flaw in the plaintiff's case. Secondly, the willfulness requirement under the statute, which requires individualized proof. In addition, the question which is fundamental to the penalties question, whether the individual employees appeared at the store and to claim their pay after termination or discharge, all those were highly individualized issues. And that information is not available in the data systems at Walmart? They are not. It's not available in the data systems, the computerized data systems that Dr. Shapiro limited himself to. It is available in personnel files and the personnel managers, but Dr. Shapiro purposefully limited himself from reviewing that information. I think in central district California, class certification issues by local rule have to be decided within the first 90 days. And the only reason I'm looking at it, clearly class certification issues are to be determined as early as possible. And Duke's frankly made some sense to me in terms of a relaxed approach at that early stage. If you've got to make a class certification decision within 90 days and the first discovery request doesn't give you everything that you need, you're basically the plaintiff was thrown out of court. No class certification, right? Well, Your Honor, it's a very important decision during the litigation. And if there is a limit on time, I think the Federal rules say rule 23, as soon as practicable. Right. And I think it is a task that is formidable, I think, for the district judges. But, for example, Chief Judge Sirica's decision in hydrogen peroxide talks about the fact that the district judge must look at all the evidence and make findings based on the evidence. And we're not underestimating the fact that that is a significant task. But it's such a crucial point in the litigation. If the class is certified, it changes the dynamic. And that's why there's 23F petitions as well. So I don't disagree, Your Honor, that there is a – there are obligations on the district court and that it's a significant one. But these are decisions that must be made at the rule 23 stage. Do you ever consider a summary judgment motion at the trial court here? Well, the summary judgment is a possibility, but then we're talking – again, it sort of goes to the class certification decision. That can be bad for the plaintiffs if it turns out the class was wrongly certified. And a defendant comes in and moves for class certification and wins. All the plaintiffs have lost when maybe their claims could not be adequately represented at the class – as a class. And with that, I will reserve my remaining time unless there are other questions. Mr. Morrow. Good morning, Your Honors. In response to Judge Layton's question, there is a summary judgment motion pending. This was pending after class certification, Your Honor. Your Honor, I must – Your Honors, I must respectfully disagree with opposing counsel as to whether this case represents a question of challenging an incorrect legal conclusion employed by the lower court or, in fact, it is a matter of their challenging the discretion exercised by the lower court. What the other side is doing is giving no real deference to the analysis and investigation and consideration – pardon me – done by the district court. This district court, in its order, went into great detail, not only analyzing Dr. Shapiro's work, but also analyzing Dr. Martin's criticism of that work. And came to a conclusion. The conclusion was that any errors in Dr. Shapiro's work were minimal and, in fact, could be corrected, were corrected, and the difference was two one-hundredths of 1 percent of a correction. Of course, that's talking about errors of calculation. And as I read your position, it seems to be focused, in effect, entirely on the fact that the amount of the wages due was miscalculated. And whether there's a one or two-tenths of a percent difference, I mean, who cares, okay, at this stage. But the real question that strikes me is not whether the amount of the wages due was miscalculated, but rather whether, in order to prevail at trial, you would have to show that the employees received their wage check. That is, that they met the presentment requirements. And only then would it matter whether the wage amount was miscalculated. And that, as I understand it, neither Shapiro nor through any other source, is there any proffer? And so to me, the district court, if that's all correct, would have just plainly erred legally. No, Your Honor. Respectfully, the issue of whether the employee must present themselves for tender under Section 208 of the Labor Code was directly addressed by the lower court, was addressed in footnote number 5 of the lower court. And the issue, we have to understand, as the lower court, as the district court noted, is miscalculation. That's why you see that's where I disagree. And so I need you to persuade me why the issue is miscalculation instead of whether the employees received their payment. I'll be happy to persuade you about that, Your Honor. The fact is that Walmart, in its records, in the very records that it uses to report to the taxing authorities, the wages it has paid, not the wages it intends to pay, not the wages it may pay, not the wages that have only been picked up by a check, but the wages it has paid, those are the very records that Dr. Shapiro relied upon. Those are the records that the district court found Walmart had conceded were made contemporaneously with either the cutting of a final check or the payment of cash. So what happens under California law is that if, and they're talking about the situation, did an employee actually come in for their final check, if in that rare situation, which we've shown is less than 10% of the time, they have an obligation to escheat that money for the benefit of the employee to the State of California. What they don't get to do is keep the money and say he never came back for his check. It's now Walmart's money. But the fact is that whether or not the check was actually picked up makes no difference in the fact that the amount of the final payment either actually, excuse me, actually given to the employee or rarely escheated to the State wasn't a miscalculation. It was an underpayment. And if we look at the---- It's not an underpayment unless it's paid. I mean, that's the whole point I'm making, is that you've got to violate the wage code, and it seems to me that California law has made that very clear. But they are paid. The guy has got to come in and pick up his check or he's got to have designated an address where he wants his check mailed. And how do you prove that? Your Honor, there is one other step. Or you gave two examples. Pick up the check, designate where it's mailed. There's a third step or a third alternative.  That is why, Your Honor, Walmart has reported every one of these wages found in its database as having been paid. They don't list them as only paid when someone comes in to get a check. They have conceded in the lower court that the moment the check is cut or the cash payment is tendered, that they record that contemporaneously as paid. And that's what they have to do. We're not criticizing that, because that is what they're required to do. It is paid. If, in that rare circumstance, someone hasn't come in, then the money goes for the employee's benefit to the State of California. If we look at the analysis that the district court did, it's a very good example of the applicability of Section 208, in that she denied certification of subclass number 3. And what is the difference between the three? Yeah. Subclass number 3 may be working backwards. Subclass number 3 was a class of individuals that we proposed who received, ultimately received, all wages due them, but they got them late. They didn't get them timely. I mean, what is the legal difference between the three subclasses? Why, in other words, is it logical to treat 1 and 2 differently from 3? Because, just exactly as the district court found in footnote 5. Yeah, but footnote 5, footnotes, I mean, who reads footnotes? I mean, I'm looking at what she really decided, not what was an aside. Right. This wasn't an aside. And in prior, the footnote that I'm talking about comes in regard to the body of the text where the Court denies certification of subclass 3. And she denies it because in the case of subclass 3, it's not a matter of calculation. Subclass 3 requires that the employee pay back. So if an employee secreted himself or herself from final payment, then you could not determine how late the payment was. That's the difference with what we're dealing with here. Here, in subclasses 1 and 2, it doesn't matter when the employee got the check because. It's an underpayment. Yes, Your Honor. That's exactly right. Right. And that is why Section 208 of the Labor Code is literally a red herring in this case. Going even beyond that and going to, and I hope I've addressed, Judge Reimer, your question. Thank you. Going beyond that into the issue of exactly what burden do we put on district class actions in light of Rule 23C1A's requirement that class certification motions be brought as soon as practical? That's exactly, this case is an example why to hold plaintiff's counsel to a standard equivalent to a summary judgment motion at the certification stage is absolutely inappropriate. Here, we brought our motion. The record is undisputed. After our motion was brought, the other side was taking Dr. Shapiro's deposition and criticized him. Why didn't you examine, sir, the cash office database? Now, we had put out discovery, we asked, we demanded production of all databases that in any way contain any data concerning payroll payments, vacation pay, personal pay, and Dr. Shapiro's answer was she didn't produce it. He didn't give it to me in response to discovery. So then they filed their opposition to our motion, criticizing Dr. Shapiro for not having seen this. Of course, as the district court noted, Dr. Shapiro in five days after getting the motion was able to modify his conclusions. The point I'm making is that all discovery cannot be completed at this early stage to subject the certification motion to that standard that they are asking, which is really the equivalent of a summary judgment. What would be your game plan, never mind specifics, but what's your game plan for approving the two subclass claims? Our game plan, Your Honor, is to introduce in general, is to introduce Walmart's records to the jury, to have our expert explain the amount of underpayment that he has calculated from those records. We also intend to cross-examine Dr. Martin, because she has determined a different, slightly different, not by very much, but a slightly different number as to the amount of underpayment. Then we will introduce evidence as to the knowledge of Walmart that there was a systemic pattern of not paying all vacation and personal time was systemic throughout the state of California, throughout the company in general, but our class is only California employees. And we will establish that Walmart had corporate knowledge of this. In fact, in several years, instituted an internal program to investigate how to get the problem, then abandoned that program when they found it would have been difficult for them, we don't know why, did not modify their computer system to fix the program. We intend to show, we believe that there is a very simple, straightforward method that that can be fixed. We believe we can show that other large corporations, massively large nationwide corporations, are able to have simple computer systems that don't do this. We will also believe we can show that as to the vacation and personal times on the books, there may have been a zeroing out of that automatically as part of Walmart's system. So you asked for kind of a general, I think maybe I gave you too many specifics. Where's the proof of the violation of 203 and 208? We're not claiming the violation of 208, it's 203, Your Honor. The violation of 203, Your Honor, is the systemic problem that permeates Walmart's practices and the knowledge by Walmart that the problem does in fact exist and their failure to do anything about it. The fact that they didn't take any action. Finally, I think again just should be emphasized that even at the early stage of litigation, the district court here, let me back up, I think it is unfortunate that the district court made the comment that a full daubered analysis is not required at the certification stage. I think as you talk about footnotes being an aside, I think that was an aside. Isn't that what Duke says? Yes, it is what Duke says, Your Honor. Which is now vacated. Correct, that's why we're aware of that. The point I'm trying to make, though, is that if you look at what this district court did, she did in fact analyze the testimony offered by the experts in great detail and reached a conclusion. And it would be respectfully submitted by us that that conclusion as to the reliability of the expert meets the requirements of Federal Evidence Code 702, that the testimony can prove useful to the trier of fact in making the determination of facts or issues in the case. That's the requirement. If the requirement is embodied in 702 as amended in 2000, and that is exactly what the trial judge did. She acted appropriately and she acted well. And with 25 seconds left, if the Court has any further questions, I'll be happy to answer them. Thank you very much. Your Honors, first of all, I think I want to make clear that much of what counsel just said is not part of the record. There's no evidence of the record on this ISCHEAT process and the ISCHEAT database. There's no evidence of this willfulness point. In fact, the district judge pointed out that plaintiffs had not offered any specific examples of proof that they would offer for that. And again, that's very much like what happened in hydrogen peroxide, where the Third Circuit said, you can't just say, here's what I think I'm going to do, without giving some evidentiary predicate to demonstrate that you would be able to prove the elements of the claim on a class-wide basis. The Section 208 could not be clearer in the code that every employee who is discharged shall be paid at the place of discharge and every employee who quits shall be paid at the office or agency where they worked. And the other sections make clear that to trigger the penalty obligation, the employee has a duty to appear at the store and that's a predicate to a willfulness finding. And the district court on page 11 of the excerpts of record made very clear both that that's a requirement and that, quote, this information is not contained in any of the electronic databases at issue and can only be determined on an individualized basis. So what is your response to the footnote 5 issue? The footnote 5 issue, I think, is another flaw in the analysis. The court, the principal flaw in the district court's analysis there is that the court relied on Dr. Shapiro's assumption that the employee was paid when an entry in the data was made or a check was cut. And the evidence is actually absolutely to the contrary. I think page 430 in the excerpts of record, Dr. Martin's testimony, talked about how the fact that there may have been an entry does not mean that the employee came and obtained the paycheck, and it does not demonstrate at all that the appearance requirement had been satisfied. Yeah, well, Mr. Moreland says, okay, that's well and good, but I don't have to worry about that, because the only thing that makes a difference is in this calculation, that is, there is an underpayment. That's it. End of story. I think that's just incorrect, Your Honor, under section 203 and under the other sections of the labor code, which require that the employee appear and meet his or her obligations within 30 days. If they have not appeared or given mailing instructions, then they're entitled to no penalties whatsoever. And the record also reflects here that Walmart's personnel managers went to great lengths when an employee wouldn't appear to call them, to find them, to mail checks out without regard to whether they had appeared or not. So the fact that the payments were made does not give any indications whether an individual employee had been paid. So even if there's a systemic underpayment that occurs because of the computer system that is being used or the methodology used by Walmart, still there would not be any certifiable class on the basis that for the reason that it has to be demonstrated when or whether a person actually physically presented. For the penalties, Your Honor, that's correct. And that's clear under the statute. And just two other points. On the systemic note, I think the best evidence that there's no ability to prove a systemic problem based on these records or anything else is the fact that two of the three-name plaintiffs were overpaid, Ballard and Wiggins. And the district judge in footnote 9 noted that plaintiffs conceded that below. So the two of the three people who are the named plaintiffs in the class, Mr. Ballard is the only named plaintiff in the subclass 2, which requires reversal of that. Their expert was not even able to demonstrate through his analysis that they were underpaid. And I believe my time is up. Anything else? Okay. Thank you. Thank you very much. Thank you, counsel, both of you, for your argument. The matter just argued will be submitted.
judges: Leighton, Rymer, Tashima